Georgia Southern & Florida Railroad Co. *v.* George.

1. Where a motion for a new trial has been made and overruled, and a bill of exceptions assigning error in overruling the motion has been duly certified, and by reason of negligence or inadvertence the motion is not specified to be sent up in the record, the Supreme Court, upon application by counsel for plaintiff in error, will, by virtue of the act of December 22d, 1892 (Acts of 1892, p. 113), order the clerk of the court below to certify and send up the motion in order to complete the record, so that the case may be retained in this court and decided upon its merits.

2. The above mentioned act is not in conflict with the constitution by reason of failure to distinctly describe the act to be amended. The description is sufficient. It does not merely refer to the title of the act to be amended, but consists of a literal transcript of the section to which the amendment applies. Nor does the amending act repeal the second section of the act of 1889, of which it is amendatory.

3. The *prima facie* case in behalf of the plaintiff, so far as establishing negligence by the defendant is concerned, resting alone upon the presumption of negligence raised by statute against the railroad company, and this presumption having been fully overcome by the uncontradicted evidence introduced by the defendant, and the undisputed physical facts manifestly indicating that the death of the plaintiff's husband was caused by his own gross negligence in attempting to board a moving train, the verdict against the company was not authorized by the evidence, and was therefore contrary to law.

4. Conceding that the court committed no error of law in charging the jury or otherwise in the progress of the trial, it was error to deny a new trial on the substantial merits of the case as developed by the evidence.

January 8, 1894.

Action for damages. Before Judge Bartlett. Bibb superior court. April term, 1893.

Gustin, Guerry & Hall, for plaintiff in error.

C. C. Duncan, W. D. Nottingham and J. L. Hardeman, *contra*.

Lumpkin, Justice.

The bill of exceptions recites that there came on to be heard in the court below "a cause in which Maggie L.

George was the plaintiff, and the Georgia Southern &
Florida Railroad Co. was defendant, the same being a
motion for a new trial then and there pending in said
court, in behalf of the defendant," and that the motion
was overruled. The only error complained of is the
judgment overruling this motion, and yet, in specifying
the material portions of the record to be sent up to this
court, the motion itself is omitted entirely. This omis-
sion was, of course, the result either of negligence or
inadvertence. When the case was called here, a motion
was made to dismiss the writ of error on the ground
that nothing was presented for the consideration of this
court, it being impossible to determine whether over-
ruling the motion for a new trial was erroneous or not,
without examining the motion itself, which could not
be done because, in consequence of the failure to specify
it, that paper was not in the record. The motion to
dismiss was met by an application by counsel for the
plaintiff in error, based upon the act of December 22,
1892, amendatory of the Supreme Court Practice Act
of 1889, for an order directing the clerk of the superior
court to certify and send up the motion for a new trial,
in order to complete the record so that the case might
be retained in this court and decided upon its merits.
In reply to this application, counsel for the defendant
in error insisted that the act of 1892 authorized this
court to order sent up a portion of the record which
had been omitted, but which might be necessary in
order to fairly and fully adjudicate the questions at issue
and the alleged errors, only when such omission ap-
peared "from the reading of the reporter's statement,"
or "from the argument of counsel," or "in the con-
sideration of the same preparatory to making up the
judgment of the court"; and consequently, that when
counsel discovered, before the case was opened in this
court, that an essentially necessary portion of the record

had not been specified or brought up, the provisions of the act did not apply, and the case must, inevitably, go out of court. Counsel for defendant in error also insisted that if this view of the act of 1892 was not correct, that act was unconstitutional, because it failed to comply with par. 17 of sec. 7, art. 3 of the constitution, providing that: "No law, or section of the code, shall be amended or repealed by mere reference to its title, or to the number of the section of the code, but the amending or repealing act shall distinctly describe the law to be amended or repealed, as well as the alteration to be made." Code, §5076. The point was also made that the act of 1892 repealed the second section of the act of 1889. We will dispose of the questions thus raised, though not precisely in the order stated, and then deal with the case upon its merits.

1. The trend of all recent legislation in this State has been to prevent the dismissal of cases on formal or technical grounds. We doubt if even a literal construction of the act in question would confine its operation within the narrow limits contended for by counsel. But giving its provisions a liberal construction, which the legislature doubtless intended, we regarded it our duty to grant the application made by the plaintiff in error. This court has no disposition whatever to dismiss cases when it is legally possible to hear and dispose of them upon their merits, and therefore we are willing to give a cheerful obedience to what we are satisfied is the legislative will upon this subject. The lawmaking power seems desirous, in the interests of litigants, to overlook professional sins of omission and commission, and to direct this court to do likewise. While, for many reasons, it would be desirable to require attorneys to come up to a higher standard of accuracy and diligence, the purpose of the General Assembly, as manifested through a series of legislative enactments cover-

ing a period of several years, is, and has been, to further
the administration of justice by securing the hearing
and determination of all cases upon their merits, with-
out regard to technical errors or deficiencies. Construed
in this spirit, and viewed in the light of other legis-
lation tending in the direction indicated, we think the
act of 1892 was intended to meet just such a case as
that now before us. The motion for a new trial ought,
undoubtedly, to have been specified, and we are at a
loss to understand how counsel usually so diligent
omitted to do so. Be this as it may, we considered it
our duty to decide that we would send for a certified
copy of this important paper, although the fact of its
omission was discovered before the reporter's statement
was read and, of course, before the argument of the
case proper was begun or this court had taken the case
into consideration preparatory to making up its judg-
ment. We felt, and still feel, that it would to a large
extent defeat one of the main objects of the act were
we to hold it could not be made available when an omis-
sion of this kind was discovered before the case was
opened in this court. In our opinion, the act not only
authorized the granting of the application in question,
but required us to grant it.

2. There is no merit, we think, in the position that
the act of 1892 repealed the second section of the act
of 1889. After a careful examination, we are unable
to perceive any conflict, and are satisfied that there is
entire harmony between the two acts, and that both may
stand together.

We will now dispose of the constitutional question.

The amending act, in our opinion, sufficiently de-
scribes the act to be amended. Something more is done
than merely to refer to the title of the act of 1889.
The act of 1892, after declaring that certain words shall
be added to the fifth section of the act of 1889 at the

conclusion thereof, then sets forth in full section five of
the amended act as it will read after the amendment,
and this necessarily involved a literal transcript of that
section as it originally stood. This, we think, so effect-
ually described the act of 1889 as to leave no possible
doubt that it was the act intended to be amended by the
act of 1892. No other act ever passed by the General
Assembly of this State had in it a section in the lan-
guage of the fifth section of the act of 1889, and there-
fore, when this section is fully transcribed in the amend-
ing act, the act to be amended is identified beyond any
possibility of doubt. It is true that the "description"
does not precede, but follows, that portion of the act of
1892 which declares what the amendment shall be. The
order of arrangement, however, is immaterial. The act
of 1892 must be considered as a whole, and when this
is done, it will appear that the act of 1889 is distinctly
designated, and that its identity would be certain, irre-
spective of the references to its title which appear both
in the title and in the body of the act of 1892. We
think this was a substantial compliance with the re-
quirements of the constitution.

Accordingly, the motion to dismiss was overruled;
and counsel then agreed that a certified copy of the
motion for a new trial might be immediately filed in this
court in order to complete the record, which was done,
and the hearing of the case proceeded without delay.

3-4. The court erred in refusing a new trial. The
plaintiff's husband was ejected from one passenger-train
of the defendant, and about an hour afterwards was
killed by another passenger-train upon defendant's road,
a mile or more from the point where he was ejected from
the first train. The evidence presents some conflict as
to whether or not the servants of the company were
justified in putting him off that train. There is no dis-
pute that he was, to some extent, under the influence of

liquor; and according to a decided preponderance of the evidence, he was guilty of such disorderly conduct that his ejection was not only justified, but entirely lawful and proper. There being, however, some evidence to the contrary, we must deal with the case upon the theory that he ought to have been permitted to remain upon the first train, as the jury might have so found. Upon this assumption, it becomes necessary to inquire as to the character of the place at which he was ejected, to what extent he was affected by the liquor he had taken, and what he did after being put off the train. There was nothing in the evidence to show that at the place where the deceased was ejected, he was in any more danger of being injured than would be the case upon or near any railway track. On the contrary, the place of expulsion would seem to be an entirely proper one, having regard to his immediate safety, and the means at hand for leaving there without being subjected to peril. It was just outside the corporate limits of a populous city, near the company's railroad shops, where the employees of the company and other persons frequently passed in going to and from their homes. Near by, a public road crossed the railroad, and along this he could easily and safely have returned to the city, had he been disposed to do so. It was still daylight when he was put off the train—" about sundown; light enough to see," as stated by a witness whose testimony was uncontradicted. Certain it is, that when left by the train, he was in no immediate danger, and there was nothing to prevent his going at once to a place of absolute safety. As to the extent of his intoxication, we think the evidence, fairly construed, leads to but one conclusion, which is, that he was not so far under the influence of liquor as to be ignorant of what he was doing, or in any material respect incapable of taking care of himself. He certainly was not incapacitated to such an extent

that he was unable to walk, or even to run. It was with difficulty that he was prevented by the conductor from again boarding the train, after he was put off. As it started, the deceased succeeded in catching hold of the railing and started to mount the steps of one of the cars; the train was again stopped, and a flagman held the deceased until the train pulled off a second time; and even when released, he ran after the train in order to board it, but failed in the attempt to catch it. No witness testified that he was in such condition as to be incapable of properly caring for his own safety, and his conduct would seem to utterly negative such an idea. Instead of returning to the city, as he had a full opportunity to do, he must have continued on foot in the direction of his original destination, following the train from which he was ejected, because, something more than an hour later, his dead body was found on the track of the railway, about a mile from the place where he had been ejected. Our conclusion, therefore, is that even if his expulsion from the train was a wrongful act on the part of the company's servants, this act was not the proximate cause of his death. This case is entirely unlike those where a man who is helpless from drunkenness, or other cause, is left in a situation where he is likely to be injured should he remain, or, in attempting to leave the point where he was ejected, would be subjected to danger. The homicide of the deceased did not occur at the place of ejection or because of such ejection, but at another time and place, and under circumstances sufficiently remote, we think, to make it impossible, with any degree of fairness, to refer his death to the first wrong inflicted upon him by the company, if, indeed, his expulsion from the train was any wrong at all.

As to the manner in which the deceased actually came to his death, there is no positive evidence. We think, however, the fact that he was killed by a train of the

defendant is satisfactorily established by circumstantial evidence. There is no proof whatever of any negligence on the part of defendant's servants in charge of the train by which he was killed, the plaintiff relying alone upon the presumption of negligence raised by statute to make out a *prima facie* case. This presumption was fully overcome by the uncontradicted evidence introduced by the defendant. It was shown positively that neither the engineer nor the fireman was guilty of any negligence in failing to maintain a sufficient lookout, and the theory of the plaintiff that her husband was upon the track in a helpless condition, and was heedlessly run over by the locomotive and killed, is completely negatived. The engineer swore positively that, upon approaching the point where the homicide occurred, he observed a man standing near the track, but in no situation of peril. While this witness would not undertake to swear that this man was the deceased, because he merely glanced at the man when the locomotive passed him, the conclusion is inevitable that the person observed by the engineer was in fact the plaintiff's husband. The theory of the defence was, that after the locomotive passed the deceased, he attempted to board the front platform of the mail-car, fell under the cars and was crushed. This theory was supported by undisputed physical facts which would strongly tend to show that the deceased came to his death in the manner suggested. The engineer is borne out in his statement that the deceased was not upon the track in front of the train, by the fact that the locomotive, which was closely inspected shortly after the accident, bore no evidences of having run over a man. According to the testimony of experts introduced on the trial, it would be a matter of the greatest improbability, if not of utter impossibility, for a locomotive setting so closely to the track to run over a man of ordinary size without crushing and man-

gling him, which would necessarily besmear with blood the cow-catcher, and other appliances under the engine which extended down to within only a few inches of the rail and road-bed. Neither was there upon any portion of the tender any indication that it had passed over the body of the deceased. The first appearance of blood or of fragments of clothing was beneath the first car of the train. Each of the succeeding cars bore evidences of the man's horrible mutilation. Taking the evidence all together, if it did not sustain the contention of the defendant that the deceased came to his death by recklessly attemping to board a moving train, certainly it was sufficient to overcome a mere presumption that the servants of the company were guilty of negligence contributing to or causing his death.

The motion for a new trial complained of various alleged errors by the court during the progress of the trial. We do not deem it necessary to enter into a discussion of them, because we are satisfied, upon the substantial merits of the case, the plaintiff was not entitled to recover. The ejection of her husband from the first train, whether rightful or wrongful, was not the proximate cause of the homicide, and a proper determination of the question of liability depended entirely upon what occurred immediately before and at the time the deceased was killed by the second train, an hour or so later. The company having not only overcome the presumption of negligence imposed upon it by statute, but having fully vindicated its diligence as well, the verdict for the plaintiff was wrong, and ought to have been set aside.

*Judgment reversed.*